No. 3837

Second Circuit

(Second Division)

BOLINGER v. MURRAY ET AL.

(November 18, 1931. Opinion and Decree.)

Wallace & Hardeman, of Benton, and W. H. Scheen, of Shreveport, attorneys for plaintiff, appellee.

Cook & Cook, of Shreveport, attorneys for defendants, appellants.

CULPEPPER, J. This is a suit to abate an alleged nuisance created by defendants in the erection of a levee about one thousand feet in length along the south side of a graveled public highway which runs east and west on the section line dividing plaintiff's lands on the north from defendants' on the south. Plaintiff alleges that the natural drainage is from north to south over his lands onto and across the lands of defendant; that the erection of the levee complained of impedes the natural flow of the water, and causes it to become impounded during heavy rains upon plaintiff's land to his detriment and injury. He alleges that on or about April 18 or 19, 1929, rain water running across his land southward to the land of defendants was held by the levee thrown up and thereby prevented from passing over its natural course, the levee holding it on plaintiff's land; that the water thus impeded was backed up and overflowed about seventy acres of plaintiff's land and destroyed his young cotton crop, which was being cultivated on the land, also deposited floating logs and brush upon the land. The expense of reconditioning the land and replanting plaintiff alleges will, together with the loss to crop due to delay, amount to $1,000. It is also alleged that the acts of defendants in erecting the levee were malicious, thereby entitling plaintiff to recover punitive damages in the sum of $500, together with $250 as attorney's fees. Plaintiff prays for judgment ordering the removal of the levee and for a moneyed judgment for $1,750.

Defendants admitted the ownership of the respective lands, their relative positions, and the erection by them of the levee complained of, but denied that the natural drainage across plaintiff's lands was toward or across that of defendants, although they admit there is a low place, known as Bull Bayou, or Slough, situated partly on their property and partly on plaintiff's. Defendants specially deny that the erection of the levee or embankment by them obstructed the natural drainage as alleged, even if the court should find that a natural drainage existed as alleged. They allege that the natural drainage as originally existed has been completely changed by the construction by the North Bossier Levee Board of a canal on the east of the lands of plaintiff and defendants and another to the west. The police jury of Bossier parish, it is alleged, constructed a high grade for the gravel road on the section line between the respective properties which also impeded the natural flow. Defendants further aver that plaintiff himself constructed drainage ditches over his lands extending out from Still House Bayou on his east across his lands towards Bull Slough, through which drainage ditches water can and does back out of and is diverted from Still House Bayou over and across plaintiff's land into the basin of Bull Slough during stages of high water, thence finding its way across to defendants' lands;

that as a result of said changes in the drainage system of the vicinity in question all of the water from plaintiff's lands is concentrated into the drainage ditch excavated by the police jury along the north side of the road, thence it flows to the opening in said road at the bridge where the road crosses Bull Slough and there flows through this opening in a concentrated volume, out, upon and over defendants' land from one point, "thereby tremendously increasing the burden, if any there was, which is denied, of the defendants." Defendants' nineteenth paragraph of their answer reads as follows:

"They show that these canals, drainage, ditches, and the road diverted all of the water on the land of defendants at a point which would not have been the natural destination of the said waters, and increased the volume of the water which would have flowed naturally into, or would have reached any portion of defendants' adjacent estate."

Defendants further aver that certain stagnant water which rested on plaintiff's land was drained through these ditches onto defendants' land, and still further increased their burden. In paragraph five defendants John E. and J. W. Murray admit erecting the levee complained of, and state their reasons for doing so as follows: "* * * for the purpose of protecting it (their property) against extraordinary flow of water caused by building the road, and by the changes made in the natural drainage by the plaintiff * * *; they deny that this dammed or stopped up the natural drainage * * * or that it forces the water back over the land of petitioner."

Defendants denied liability for the damages sued for; also set up reconventional demand for $2,500. The grounds alleged on for its recovery are that in 1924 one J. B. Ladd, a tenant on plaintiff's property, owed defendants $2,500 and plaintiff agreed to collect this sum from Ladd for defendants, and that plaintiff collected this amount but never accounted to defendants for same.

In a well considered opinion the learned trial judge rendered judgment in favor of the plaintiff, and against defendants, ordering them to remove the levee complained of within ten days from the time the judgment became final and in default thereof that the same be removed at the cost of defendants. The demands of plaintiff were otherwise rejected, as were also defendants' reconventional demands.

From this judgment defendants appeal.

Plaintiff, J. C. Bolinger, owned the E½ of SE¼ of Sec. 24, T. 23 N. R. 14 W. and W½ of SE¼ of Sec. 19, T. 23 N. R. 13 W., in Bossier parish. Defendants, J. E. and J. W. Murray, owned adjacent to plaintiff on the south section 25, T. 23, N. R. 14 and W½ of W½ of Section 30, T. 23 N. R. 13 W. Both plaintiff and defendants were at the time of filing this suit, and had been for some years prior, cultivating their respective lands, or a portion thereof. These lands had formerly been swamp lands subject to overflow and noncultivatable except for some ridges or high places here and there about over them. To the east of these swamp lands are the hills and to the west flows Red River. A natural drain known as Still House Bayou comes from the north and courses generally southward through the bottoms near the hills on the east. This bayou passes through the northeastern and eastern portions of plaintiff's land and emerges at the southeast corner where it crosses the public road, over which is a bridge. The bayou thence runs on southward through the extreme east portion of the lands of defendants. Along or near the west bank of this bayou is a ridge of slight elevation, and just west of the ridge is a de-

pression which many years ago constituted the bed of Phelps lake, but which has ceased to exist as a lake due to natural deposits and the system of drainage instituted by the North and South Bossier Levee Boards. The lands of both plaintiff and defendants, especially those portions directly connected with this controversy, lie within this old lake bed. The lowest point of this lake bed from north to south is what is known as Bull Bayou, or Slough. According to the map of plaintiff's engineers, Bull Slough, as we shall hereafter call it, has a well defined course, which begins with a wide or beaver tailed spread up in sections 14 and 23, and contracts to a narrower channel running in a southeasterly direction through plaintiff's E½ of SE¼ of section 24. It then crosses the public road near the southeast corner of the section, and runs southward through defendants' E½ of E½ of section 25 and empties into the extension of Still House Bayou to the south. According to map of defendants' engineers, however, this slough has no defined channel; in fact, it is not even shown on this map. The testimony is conflicting as to whether or not there is a well defined channel to this slough, such as to make its banks visible. The preponderance of the testimony, however, as found by the trial judge, and we concur in his findings, is that, regardless of whether Bull Slough does or does not have visible banks, it constitutes the natural drainage running from north to south through the old lake bed, across plaintiff's lands over that of defendants. This natural drainage, he found, known as Bull Slough, crosses the public road at the bridge the police jury had built for the purpose of permitting drainage from plaintiff's lands, as well as other lands north of the road, across the road and on to defendants' and other lands to the south.

It is perfectly obvious from the testimony in the record that the natural drainage in that territory is from north to south and that the same is true as restricted to the particular estates of plaintiff and defendants here involved. This is especially true during high water from heavy rainfall.

There is a small area a few feet north of the bridge, along the course of the depression of Bull Slough, which is lower than the adjacent lands of plaintiff to the north and defendants to the south, upon which no doubt during slight rainfall water accumulates and remains. Before these canals were dug along the north and south sides of the public road some water during normal rainfall probably made its way from defendants' land immediately to the south and ran northward into this low area, but it is equally certain that when this low area filled up during heavy rains, this water, along with all other waters from the north, passed off by overflow southward across defendants' lands. Of course, small quantities would remain in this low area after the water subsided, and become stagnant. Defendants, however, were relieved of the burden of receiving this stagnant water by the north roadside ditch which drained it off to the east into Still House Bayou. Hence we see no cause for defendants to complain of any burden imposed on their lands on account of having to receive stagnant water from the land of plaintiff. We also fail to see the force of defendants' argument that, by the creation of the system of drainage by the levee board, by the building of the public road, and by the drain ditches plaintiff put in, the whole drainage of the vicinity has become so changed from its natural course as to create any greater burden upon defendants than their estate originally had. As a matter of fact defendants have been great-

ly benefited by the levee board drainage. It is shown that by the digging of Poston Canal from north to south on the west and dredging Still House Bayou on the east, defendants' lands have, along with plaintiff's, been converted from what was formerly a lake, into a rich, cultivated area.

Just to the west of Bull Slough depression, and between it and Poston Canal, is what is called Ash Ridge. It is the water coming from the north and collected between this ridge and the ridge to the east of Bull Sough, which flows southward, along Bull Slough depression, and along the old lake bed depression. Defendants' contention is that this water is caused to be diverted from its original spreading flow down (they do not, however, admit that it is downward) this lake bed depression when it reaches the four or five foot grade thrown up by the police jury for the road bed, and there enters the roadside ditch which conducts it to the opening under the bridge at Bull Slough. They urge that, thus concentrated, it runs through this opening and onto their land at one point instead of being permitted by the natural drainage to flow fan-like all across their lands. Defendants contend that the water thus concentrated at that one point increased the burden of their lands. We cannot agree that this is true, since these waters had to flow under natural drainage across defendants' lands. Their lands had always been burdened with, not only the water which now flows over them, but they were burdened with a much larger quantity before the levee board constructed Poston Canal and dredged out Still House Bayou, and the police jury dug the drainage ditches along the road. Mr. J. E. Murray, one of the defendants, testifying, was asked if he would be better off without this present drainage than he was before it was put in, replied, "Oh no. The land was not subject to cultivation until the drainage was put in."

Mr. J. W. Murray, the other defendant, testified that the water in going through the opening in the road at the bridge would, during high water, have a tendency to cut their lands up. When asked, however, if the water had ever cut the land up he admitted that it never had. It therefore appears that no damage has yet been done to defendants' lands by this volume of water passing through this one point at the bridge. It would be reasonable to conclude that if it should cut out a channel it would amount to vastly less damage to the land as a whole and growing crops on it than it would for the water to spread out over and overflow the land as a whole. Besides, the plaintiff is not responsible for the concentration of the water at the bridge. This was caused by the police jury in building the road.

The Supreme Court in Petite Anse Coteau Drainage District v. Youngsville Drainage District, 146 La. 161, 83 So. 445, 446, states that the accepted and well settled doctrine regarding the concentration of waters flowing from the superior estate onto the lower estate is set forth in Ludeling v. Stubbs, 34 La. Ann. 935, as follows:

"The owner of the lower lands of two adjacent estates can do no act which would impede the natural flow of waters on his lands, from those of the higher estate. The owner of the superior estate may make all drainage works which are necessary to the proper cultivation and to the agricultural development of his estate. To that end he may cut ditches and canals by which the waters running on his estate may be concentrated, and their flow increased beyond the slow process by which they would ultimately reach the same destination.

"But the owner of the superior estate cannot improve his lands to the injury of his neighbor, and thus he will not be allowed to cut ditches or canals, or do other

drainage works by which the waters running on his lands will be diverted from their natural flow, and concentrated so as to flow on the lower lands of the adjacent estate at a point which would not be their natural destination * * *." Citing Civil Code, art. .660, and numerous decisions.

The essentials of the rule relative to the making of ditches and canals on the upper estate, and the concentration of the waters so as to pass out at some one point upon the lower estate, are that it shall be done in the interest of proper cultivation and the agricultural development of the estate. The further and additional requirement is that the waters be not diverted from their natural flow and concentrated so as to flow over the lower lands of the adjacent estate at a point which would not be their natural destination. Neither plaintiff nor the levee board nor the police jury, as we view this case, and as found by the lower court, have done anything by which defendants' lands have been injured. On the contrary, their lands have been greatly benefited. Nor have these concentrated waters been diverted from their natural flow or prevented from reaching their ultimate, natural destination. It is conceded by all parties that what has been done was in the interest of the agricultural development of all these lands. It is true that the ditches along the roadside were put there by the Police Jury to drain the road bed, yet they serve the purpose of draining these lands as well. The same can be said of the cut in the roadbed where the bridge is built. While these roadside ditches have a slight fall, they fall slightly toward Still House Bayou and away from Bull Slough. Defendants contend that water backs up these ditches during high water onto the land. They also contend that the water backs out from this bayou up the drainage ditches dug by plaintiff further up the bayou, and this back water, after reaching a certain stage, flows over onto plaintiff's lands above increasing the volume of water on his lands to be precipitated down upon defendants at the one small outlet at Bull Slough bridge. These three drainage ditches cut by plaintiff extend from Still House Bayou up the eastern slope of the ridge to its crest where the ditch is shallow. The water is thus drained from the ridge crest east into the bayou, and the ditches from the crest of the ridge westward or toward Bull Slough drain the west slope into the slough. It is true that defendants introduced testimony of their engineers going to show differently. The trial judge who heard the testimony states:

"Defendants contend that their burden has been so increased by the construction of the canals and the highway that they are relieved from any right that plaintiff might have had. They claim also that the drainage ditches dug by plaintiff on his land increased the burden because they claim that water from Still House Bayou backs out on the land of plaintiff and would run down on their land but for the levee, but from all the evidence in the case I do not find this to be a fact."

The court in its able opinion further states:

"They further claim that the water from Still House Bayou backs out in the road ditches and would come upon their land but for the levee. From all the evidence in the case it is my opinion that if the levee erected by defendants was cut at the opening in the highway at Bull Slough, that this would take care of all the rain water that would come from the north, and that if Red River gets high enough to back water through Still House Bayou and the road ditches and drainage ditches dug by the plaintiff, that it will already have covered the lands of the defendants by backing up directly from the South."

We think the learned trial judge in his very able opinion has correctly solved these rather difficult questions, both from the standpoint of the facts and the law applicable, and his judgment is accordingly affirmed.